# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **TONY ALEXANDER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:12-CV-490** |
| | § | |
| **STATE FARM LLOYDS,** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND ORDER

The access of ordinary citizens to courts of law is a justifiable source of pride in this country. But each participant in the judicial process must bring to it a measure of good faith. He must bring to it a genuine belief that he has been wronged, or a genuine belief that no wrong has been done against another. Without this good faith, the access of ordinary citizens to courts of law is no longer a tool for the redress of wrongs, but another avenue for perpetrating them.

Plaintiff Tony Alexander possessed a homeowner's insurance policy with Defendant State Farm Lloyds ("SFL") when his newly constructed home caught fire and burned down on or around July 24, 2005. He sought and received coverage from SFL for his loss. But he failed to act in good faith with SFL when he lied during the claims process. He failed to act in good faith when he concealed material facts during the claims process. Most importantly, he failed to act in good faith when he subsequently sued SFL for insurance coverage which he had clearly and inarguably forfeited through his own

1

disingenuous actions. Because Mr. Alexander filed and pursued this frivolous lawsuit against SFL in bad faith and for no apparent purpose other than to extract a nuisance settlement from SFL, the Court **GRANTS** Defendant's Motion for Sanctions (Doc. No. 65) and orders Plaintiff to reimburse Defendant's attorney's fees incurred through February 17, 2012. The Court also **GRANTS** Plaintiff's Motion for Entry of Order of Dismissal (Doc. No. 63) and **GRANTS IN PART** and **DENIES IN PART** Defendant's Cross-Motion for Attorney's Fees and Costs (Doc. No. 64).

## I.    INTRODUCTION

### A.    Factual Background

Mr. Alexander had a homeowner's policy with SFL (the "Policy") that covered a newly constructed house at 14 Kings Lake Estates Boulevard, Humble, Texas (the "Residence"). On or about July 24, 2005, the Residence was damaged by fire. Mr. Alexander sought and received coverage under the Policy, including over $1 million under the Policy's Dwelling coverage, and additional payments of approximately $77,000 for Additional Living Expenses ("ALE"), personal property damage, and securing of the Residence. (Doc. No. 1-3, at 38.)

Mr. Alexander submitted additional personal property claims, ALE expenses, storage expenses, demolition and debris removal, and Option ID ("Increased Dwelling") claims to SFL for reimbursement (the "Remaining Claims").[1] In the process of adjusting these claims, SFL determined that Mr. Alexander had made knowing misrepresentations

---

[1] Option ID refers to a provision of the Policy which obligated SFL to pay Mr. Alexander an additional 20% over the Policy limit, if the costs of rebuilding actually exceeded the Policy limit. The Policy limit was approximately $1 million, so the amount of additional coverage provided by Option ID was approximately $200,000.

and voided the Policy pursuant to its Concealment or Fraud provisions. The Court will briefly recount the conduct engaged in by Mr. Alexander which triggered SFL's decision.

### 1.      Mr. Alexander misrepresented his need for ALE

Mr. Alexander and his family were not living in the Residence at the time of the fire, but in another home he owned at 8905 Seeker Drive (the "Seeker Residence"). (Doc. No. 60, at 123-24.) Immediately after the fire, Mr. Alexander told SFL that he had to vacate the Seeker Residence because he had a tenant moving in by July 31, 2005—the date on which he had planned to make the Residence his full-time home.[2] (*Id.* at 12-13; Doc. No. 58, at 172-73.) Based on this representation, SFL paid ALE expenses to Mr. Alexander. (Doc. No. 58, at 175-76.) But no tenant ever moved into the Seeker Residence (Doc. No. 60, at 14-17), which SFL discovered in February 2006 (Doc. No. 58, at 236), after it had already paid Mr. Alexander $8,500 per month in ALE to rent a furnished home (Doc. No. 58, at 176). In all, SFL paid Mr. Alexander approximately $70,000 in ALE. (Doc. No. 59, at 119.) Mr. Alexander has never been able to produce the lease agreement or the name of the tenant who was scheduled to move into the Seeker Residence. (Doc. No. 60, at 13-14.)

### 2.      Mr. Alexander submitted fraudulent leases and receipts to SFL in connection with his claim for storage expenses

According to Mr. Alexander, before the fire, his personal property was being stored in several places, including the houses of family and friends. (Doc. No. 60, at 38.) This

---

[2] Mr. Alexander reiterated on August 23, 2005 that a tenant had moved into the Seeker Residence, when he tried to work a "deal" with SFL on storage expenses. Mr. Alexander proposed to SFL that he "buy out" the lease on the Seeker Residence and charge SFL $600 per month—what he would receive in rent—to store his property there. (Doc. No. 58, at 191-92; Doc. No. 65-13 [Def. Trial Ex. No. 242], at 3.) Mr. Alexander's storage expense claims are discussed in more detail in Section I.A.2.

property was intended to be moved into the Residence. (*Id.*) After the fire, Mr. Alexander requested that SFL pay him or his sister the cost he would otherwise incur moving the items into storage. (*Id.* at 39.) SFL declined (*id.*) but told Mr. Alexander that it would pay any storage costs he actually incurred. (Doc. No. 58, at 173-74, 176-77, 184, 208.) Mr. Alexander then submitted lease agreements from "Jackson Storage" to SFL for reimbursement. (*Id.* at 198; Doc. No. 65-18 [Def. Trial Ex. No. 211], at 2-10; Doc. No. 65-10, at 1-10.) Mr. Alexander followed up in January 2007 by submitting receipts for storage expenses allegedly incurred at "Jackson Storage." (Doc. No. 59, at 49-50; Doc. No. 65-20 [Def. Trial Ex. No. 209], at 2-5.) Upon investigating these claims, SFL discovered that "Jackson Storage" does not exist.[3] (Doc. No. 59, at 51-53, 55-64.) Instead, what Mr. Alexander had been referring to as "Jackson Storage" was storage space outside the residence of a man named Mr. Bourda. (*Id.* at 55-59.) When pressed by SFL about his storage expense claims, Mr. Alexander stated that he did not know if Mr. Bourda's house was "Jackson Storage;" that he did not know who paid the storage expenses; and that he could not produce anything to verify that the payments were made, because they were made in cash. (*Id.* at 70-71.) Mr. Alexander now admits that he and his wife or mother created the "Jackson Storage" lease agreements and the storage receipts in order to comply with SFL's request for documentation of his storage expenses. (Doc. No. 60, at 45-49, 60-62; Doc. No. 65-15, at 19-36.)

---

[3] The "Jackson" in "Jackson Storage" refers to Tammy Jackson, Mr. Alexander's sister. (Doc. No. 60, at 38; Doc. No. 65-15, at 36.) When SFL asked Mr. Alexander who Tammy Jackson was—as her name appeared on the lease agreements—he claimed that she was the wife of Mr. Bourda, the owner of the storage facility. (Doc. No. 59, at 59.)

### 3.     Mr. Alexander misrepresented the cost of architectural plans

Mr. Alexander included "architecture plans" on a list of personal property lost in the fire, which was submitted to SFL for reimbursement. Although SFL obtained a copy of the original plans from county records, Mr. Alexander refused them on the basis that they were "not buildable." (Doc. No. 58, at 193-95.) Mr. Alexander maintained that he would have to purchase new architecture plans at a cost of "7% of project cost" or $87,500. (Doc. No. 60, at 69-70; Doc. No. 65-29 [Def. Trial Ex. No. 100], at 5.) Upon investigation of this claim, SFL learned that the actual cost of the new plans was approximately $35,000. (Doc. No. 59, at 86-87; Doc. No. 65-13 [Def. Trial Ex. No. 242], at 2.)

### 4.     Mr. Alexander submitted fraudulent debris removal invoices to SFL

In September 2006, Mr. Alexander submitted to SFL a $29,160 "estimate" for demolition and debris removal.[4] (Doc. No. 59, at 32-33; Doc. No. 65-24 [Def. Trial Ex. 150], at 2.)  The estimate bore the name of "Ellis Williams." (Doc. No. 65-24 [Def. Trial Ex. 150], at 2.) SFL confirmed in October 2006 that the Residence had been demolished. (Doc. No. 59, at 34.) In January 2007, Mr. Alexander asked SFL to reimburse him $45,000 for demolition and debris removal work performed by ALA Construction—a company owned by Mr. Alexander's father—and provided another invoice for that amount. (Doc. No. 59, at 50; Doc. No. 65-25 [Def. Trial Ex. No. 154a], at 3.) The $29,160 "estimate" purportedly from Mr. Williams and the $45,000 "invoice" purportedly from ALA Construction were largely identical. (*Compare* Doc. No. 65-24 [Def. Trial Ex. 150] *with*

---

[4] SFL contends that it believed the Ellis Williams "estimate" was actually an "invoice" for work already performed. (Doc. No. 58, at 120-21.)

5

Doc. No. 65-25 [Def. Trial Ex. No. 154a].) Moreover, each was dated August 15, 2006.[5] (*Id*.) SFL asked Mr. Alexander for Mr. Williams's contact information, in order to investigate the $29,160 "estimate." Mr. Alexander was unable or unwilling to provide that information, forcing SFL to attempt to locate Mr. Williams on its own. (Doc. No. 59, at 45-46, 53, 66-67, 71-73, 77-78, 83-84, 104, 120.)

On June 24, 2008, Mr. Alexander was informed by phone of SFL's decision to deny the Remaining Claims. (Doc. No. 1-3, at 46.) A written confirmation was faxed and mailed to Mr. Alexander on July 2, 2008. (*Id*. at 47.) When one of the two letters sent on July 2, 2008 was returned to SFL on December 19, 2008, SFL called Mr. Alexander for a new forwarding address and resent the letter that day. (*Id*.) In addition to the above notice of its coverage decision, SFL also refunded to Mr. Alexander all premiums paid on the Policy. The refund was made by check dated July 31, 2008 and cashed by Mr. Alexander on August 19, 2008. (Doc. No. 19-3, at 3; Doc. No. 65-12 [Def. Trial Ex. No. 208], at 2.)

## B.   Procedural History

This case began in Texas state court on March 1, 2011. Mr. Alexander originally sued SFL and two of its agents. Mr. Alexander asserted claims against SFL for breach of contract; violations of the Texas Insurance Code; violations of the Texas Deceptive Trade Practices Act ("DTPA"); and breach of the duty of good faith and fair dealing. (Doc. No. 1-1, at 7-11.) Mr. Alexander asserted claims against the individual agents for violations of the Texas Insurance Code and the DTPA. (*Id*.) The Original Petition contained allegations

---

[5] From the appearance of the two documents, it is clear that they were created by the same person. As SFL learned during litigation, however, Mr. Williams played no part in creating the "estimate" bearing his name; Mr. Williams cannot read or write and has no employee who creates estimates or invoices for him. (Doc. No. 65-28, at 10-13.)

that Mr. Alexander was insured by SFL; that he suffered a covered loss; and that SFL denied his claims. (Doc. No. 1-1, at 6-7.) It recited the legal elements of the causes of actions alleged. (*Id.* at 7-11.) It made no mention that the Policy had been voided by SFL pursuant to the Concealment or Fraud provisions.

The inclusion of the individual agents in the lawsuit defeated diversity. On January 13, 2012, while still in state court, SFL moved for summary judgment on the extra-contractual claims, including all claims against the individual defendants, because they fell outside the two-year statute of limitations. (Doc. No. 1-3, at 27-36.) On February 17, 2012—after Mr. Alexander's responses to discovery made clear that the amount in controversy exceeded $75,000, but before SFL's motion for summary judgment had been ruled upon— SFL removed the action to federal court. (Doc. No. 1, at 9-10.)

Once in federal court, SFL reurged its motion for summary judgment on the extra-contractual claims. (Doc. No. 12; Doc. No. 19.) Although initially denied as to Mr. Alexander's Option ID and ALE claims due to ambiguity in SFL's July 2, 2008 notice of denial of coverage (Doc. No. 18), the motion was supplemented with additional evidence and eventually granted (Doc. No. 22). No further dispositive motions were filed, and the case proceeded to trial on May 6, 2013.

At trial, the parties selected a jury, and Mr. Alexander began presenting his case-in-chief. After three days of testimony from witnesses put on by Mr. Alexander, the Court excused the jury from the courtroom and inquired as to whether there existed any arguable grounds for Mr. Alexander's claims. (Doc. No. 60, at 140-41.) The Court noted that Mr. Alexander's conduct during the claims adjustment process was clearly fraudulent and more commonly engaged in by criminal defendants than civil plaintiffs. (*Id.* at 148-49.)

Mr. Alexander then requested a private conference with his attorneys. When he returned to court, he moved to dismiss his claims with prejudice. (*Id.* at 149.)

### C. Post-Trial Motions

On August 21, 2013, Mr. Alexander filed a motion for entry of order of dismissal with prejudice. (Doc. No. 63.) SFL does not oppose the motion, but has filed a cross-motion requesting the Court to award SFL its attorney's fees and costs as conditions to dismissal. (Doc. No. 64.) SFL also moved for sanctions on August 27, 2013. (Doc. No. 65.) It seeks its attorney's fees and costs.

## II. LEGAL STANDARDS

### A. Rule 41 Voluntary Dismissal

Before an opposing party has served either an answer or a motion for summary judgment, a plaintiff may dismiss his claims without consent of the opposing party and without permission from the Court. FED. R. CIV. P. 41(a)(1). Once the case progresses beyond that point, voluntary dismissal may be effectuated only by consent of the defendant or on Court authority. *Id.* 41(a)(1)-(2). The Court may impose terms on the dismissal "that the court considers proper." *Id.* 41(a)(2).

### B. Sanctions under Texas and Federal Law

This case started in state court, and ended in federal court. The Fifth Circuit has held that "state sanctions rules [apply] to pleadings filed in state court before removal." *Tompkins v. Cyr*, 202 F.3d 770, 787 (5th Cir. 2000). Federal sanctions rules apply to pleadings, papers, and actions taken in federal court.

### 1.     Rule 11

Rule 11 of the Federal Rules of Civil Procedure generally requires an attorney or pro se litigant to conduct a reasonable inquiry into the relevant law and facts before signing pleadings, written motions, or other documents, and it prescribes sanctions for violating these obligations. FED. R. CIV. P. 11. Specifically, Rule 11(a) requires attorneys and pro se litigants to sign each "pleading, written motion, and other paper" filed in federal court. Rule 11(b) deems each signatory to be certifying to the best of his "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that the pleading, written motion, and other paper:

(1)     Is not being presented for an "improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." *See* FED. R. CIV. P. 11(b)(1).

(2)     Contains only "claims, defenses, and other legal contentions" that are "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." *See id.* at 11(b)(2).

(3)     Contains only "factual contentions" that have "evidentiary support" or—if appropriately designated—"factual contentions" that are "likely [to] have evidentiary support after a reasonable opportunity for further investigation or discovery." *See id.* at 11(b)(3).

(4)     Contains only "denials of factual contentions" that are "warranted on the evidence" or—if appropriately designated—"denials of factual contentions" that are "reasonably based on belief or a lack of information." *See id.* at 11(b)(4).

Rule 11 allows a court to impose sanctions for violations of Rule 11(b) "after notice and a reasonable opportunity to respond." FED. R. CIV. P. 11(c)(1). Sanctions can be imposed on "any attorney, law firm, or party that violated the rule or is responsible for the violation." *Id.* However, Rule 11 prohibits monetary sanctions against a represented party

for violations of Rule 11(b)(2) (i.e., for advocating meritless legal positions). *See id*. at 11(c)(5)(A). Rule 11 sanctions can be imposed pursuant to a motion by the opposing party, or through the court's own initiative.

### 2.     Inherent Authority

In addition to the sanctioning authority of Rule 11, this Court also has certain implied powers to "'manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962)). One of these implied powers is the "ability to fashion an appropriate sanction"—such as involuntary dismissal of a lawsuit and the imposition of attorney's fees—"for conduct which abuses the judicial process." *Id*. at 44-45. Pursuant to such inherent authority, the Court "may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Id*. at 45-46 (quoting *Aleyska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975)).

### 3.     Texas Rule 13

Rule 13 of the Texas Rules of Civil Procedure states that an attorney who signs a "pleading, motion, or other paper" is certifying that, to the best of his knowledge "formed after reasonable inquiry," the pleading, motion or other paper "is not groundless and brought in bad faith or groundless and brought for the purpose of harassment." TEX. R. CIV. P. 13. "If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, after notice and hearing, shall impose an appropriate sanction available under [Texas] Rule 215 upon the person who signed it, a represented party, or both." *Id*.

A "groundless" paper is one with "no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law." TEX. R. CIV. P. 13. The offending paper must have been groundless at the time of filing; it is not appropriate to use Rule 13 to sanction "pursuit of an action later determined to be groundless *after* pleadings were filed." *Karagounis v. Prop. Co. of Am.*, 970 S.W.2d 761, 764 (Tex. App.—Amarillo 1998, pet. denied) (emphasis original).

But it is not enough for Rule 13 that the original petition was groundless; it must also have been "brought in bad faith" or "brought for the purpose of harassment." TEX. R. CIV. P. 13. Rule 13 contains a presumption that papers are filed in good faith. *Id.* Moreover, "[b]ad faith is not simply bad judgment or negligence, but means the conscious doing of a wrong for dishonest, discriminatory, or malicious purpose." *Keith v. Solls*, 256 S.W.3d 912, 916 (Tex. App.—Dallas 2008, no pet.). "Harass[ment]" means "'words, gestures, and actions that tend to annoy, alarm, and verbally abuse another person.'" *Id.* at 916-17 (quoting *Elkins v. Stotts-Brown*, 103 S.W.3d 664, 669 (Tex. App.—Dallas 2003, no. pet.)).

### 4.    CPRC Chapter 10

Section 10.001 of Texas's Civil Practice and Remedies Code ("CPRC") deems each signatory of a "pleading or motion" filed in Texas state court to be certifying that the "pleading or motion" meets four requirements. These four requirements track the requirements of Federal Rule 11(b), described above.

Sections 10.002 through 10.005 of the CPRC describe available sanctions and procedures for awarding sanctions against signatories who have violated Section 10.001; their clients (if any); or both. For the most part, these sections are identical to Federal Rule

11(c). Some salient differences are noted below, in the Court's analysis of SFL's Motion

for Sanctions.

## III.    ANALYSIS

### A.    It would be improper to condition Mr. Alexander's voluntary dismissal with prejudice on payment of SFL's attorney's fees.

Pursuant to Federal Rule 41(a)(2), which authorizes the Court to impose terms on a

voluntary dismissal which it considers proper, SFL urges the Court to condition Mr.

Alexander's dismissal on payment of SFL's attorney's fees. The Court does not find the

proposed condition to be proper. Attorney's fees are routinely imposed on voluntary

dismissals *without* prejudice due to the risk that the defendant will be forced to relitigate

its defense in another proceeding. This risk does not accompany a dismissal *with*

prejudice. *See Amazing Spaces, Inc. v. Metro Mini Storage*, Civ. Action No. H-08-0629,

2011 WL 22882, at *2 (S.D. Tex. Jan. 4, 2011); *see also AeroTech, Inc. v. Estes*, 110 F.3d

1523, 1528 (10th Cir. 1997).

SFL argues that attorney's fees may be imposed on a voluntary dismissal with

prejudice in "extraordinary circumstances." (Doc. No. 64, at 3.) Although various district

courts have invoked the "exceptional circumstances" justification for awarding attorney's

fees on a voluntary dismissal with prejudice, most—if not all—fail to find "exceptional

circumstances" in the cases before them. *See Degussa Admixtures, Inc. v. Burnett*, 471 F.

Supp. 2d 848, 853 (W.D. Mich. 2007) (collecting cases). More importantly, what

constitutes "exceptional circumstances" is not well defined.[6] The "exceptional

---

[6] One court has clarified that "exceptional circumstances" are not met simply because the plaintiff's claims are frivolous:

circumstances" exception may have its origins in equity cases. *See Smoot v. Fox*, 353 F.2d 830, 832 (6th Cir. 1965) ("In our opinion the allowance of [attorney's fees and expenses for preparation for trial as costs] is within the discretion of the District Court in equity cases where exceptional circumstances call for their allowance in order to do justice between the parties."). Or it may be attributable to a statutory provision that authorizes attorney's fees to a prevailing party in "exceptional" patent law cases. *See Lawrence v. Fuld*, 32 F.R.D. 329, 331-32 (D. Md. 1963) (interpreting *Krasnow v. Sacks & Perry, Inc.*—a patent infringement case in which costs were awarded on a voluntary dismissal with prejudice—to stand for the proposition that "an allowance [of attorney's fees] may be made upon dismissal where, by statute, an allowance to the prevailing party is authorized under exceptional circumstances").[7]

If *Smoot* and/or *Lawrence* are the genesis of the "exceptional circumstances" exception, its viability in a case such as this—pursued at law, with no independent

---

No exceptional circumstances have been demonstrated beyond Defendants contentions that Plaintiff's complaint was brought without a good-faith basis. Rule 41(a)(2) does not grant independent authority for awarding costs solely on the basis of vexatious litigation. Instead, parties are protected from frivolous litigation by the provisions of [Federal Rule 11]. Absent authorization under Rule 11 or independent statutory authority, this Court is precluded from shifting attorney fees to Defendants.

*Degussa Admixtures, Inc. v. Burnett*, 471 F. Supp. 2d 848, 853 (W.D. Mich. 2007).

[7] The *Lawrence* court explained that a federal statute "vests discretion in the court *in exceptional cases* to grant reasonable attorneys' fees to the prevailing party in the litigation." *See* 32 F.R.D. at 331 (emphasis original). It suggested that this statute—which is limited to patent law cases—constituted the "exceptional circumstances" in *Krasnow* which warranted an award of attorney's fees when plaintiff voluntarily dismissed with prejudice. *See id.* at 331-32. To the extent that subsequent cases have picked up this "exceptional circumstances" phrasing from *Lawrence*, they generally have not limited it to patent law cases or to cases in which independent statutory fee-shifting authority exists.

statutory authority for fee-shifting to the "prevailing party"—is questionable at best. In this case, if Mr. Alexander had lost on summary judgment or at trial, it does not appear that attorney's fees would have been available to SFL except through one of the sanctioning mechanisms discussed below. As a result, no "exceptional circumstances" warrant fee shifting from SFL to Mr. Alexander, and it would be improper to impose this condition on Mr. Alexander's dismissal.

> **B.      SFL is entitled to costs as the prevailing party.**

Rule 54 states that, unless otherwise indicated by statute or rule, "costs—other than attorney's fees—should be allowed to the prevailing party." FED. R. CIV. P. 54(d)(1). The Fifth Circuit has held that a defendant who is on the receiving end of a voluntary dismissal with prejudice is a "prevailing party" under Rule 54. *See Schwarz v. Folloder*, 767 F.2d 125, 130-31 (5th Cir. 1985). Moreover, there is no question that SFL would have prevailed at trial if Mr. Alexander had not abandoned his claims. As a result, it would be prejudicial to SFL if Mr. Alexander's act of voluntary dismissal could prevent the imposition of costs pursuant to Rule 54(d)(1). Therefore, imposition of SFL's costs is a "proper" term for Mr. Alexander's dismissal under Rule 41(a)(2), in addition to being authorized by Rule 54(d)(1).

> **C.      Mr. Alexander exhibited bad faith and an improper purpose when he filed and pursued frivolous claims against SFL.**

The Court presided over three days of trial—all devoted to Mr. Alexander's case-in-chief. It listened to more than two hours of attorney argument on SFL's motion for sanctions. It warned Mr. Alexander that it was contemplating sanctions and invited him to

defend his actions in open court.[8] It has also reviewed copious documentation of Mr. Alexander's claimed "losses" from the July 24, 2005 fire.

After the above exposure to Mr. Alexander's testimony and evidence, the Court is able to determine, without hesitation, that Mr. Alexander deliberately schemed to receive money under the Policy which he did not need to make him whole and to which he was not entitled. To summarize briefly, the testimony and exhibits produced at trial depict the following sequence of events during the claims adjustment process:

(1)   Mr. Alexander claimed he needed ALE because he was shortly to be homeless when, in fact, this was not the case. *See* Section I.A.1, above.

(2)   After the previous misrepresentation allowed Mr. Alexander to move out of the home where he had been living, he tried to arrange for SFL to pay him rent for that home under the guise of "storage expenses." *See* Sections I.A.1 and I.A.2, above.

(3)   When SFL refused to pay Mr. Alexander to store his belongings at a home he owned while he lived in a furnished home paid for by SFL, Mr. Alexander invented a fictional storage company and created lease agreements and receipts for that company which he then submitted to SFL for reimbursement. *See* Section I.A.2, above.

(4)   Mr. Alexander claimed architectural plans for his house as personal property lost in the fire, but refused a copy of those plans obtained by SFL at its own cost. Mr. Alexander insisted that SFL pay him to obtain new plans at a cost of approximately $87,000; SFL confirmed that the actual cost of the new plans would be approximately $35,000. *See* Section I.A.3, above.

(5)   Mr. Alexander provided two nearly identical invoices to SFL for demolition and debris removal, from two different business entities with two different amounts. He asked SFL to pay on the invoice with a higher amount, but

---

[8] At the second hearing on SFL's Motion for Sanctions, Mr. Alexander invoked his Fifth Amendment right not to speak. His attorney argued his position on his behalf and provided to the Court a demonstrative comprised of trial exhibits and testimony. SFL's attorneys objected to the demonstrative due to late notice. Because the demonstrative does not sway the Court's ultimate conclusion, SFL's objection is overruled.

obstructed SFL's attempts to investigate the invoice with a lower amount. As with the storage leases and receipts described above, it appears that Mr. Alexander created the two demolition and debris removal invoices. *See* Section I.A.4, above.

The above recounting is not exhaustive.[9] But it is more than sufficient to demonstrate the character of Mr. Alexander's behavior during the claims adjustment process.

As the Court noted on the record at trial, outside the presence of the jury, it is more accustomed to encountering behavior such as Mr. Alexander's in criminal fraud cases, not in civil suits affirmatively seeking insurance coverage. In fourteen years on the bench, the Court cannot recall presiding over any other case in which a litigant with such palpably unclean hands initiated legal action and attempted to cast himself as the victim in the eyes of the Court and the jury. It was, this Court hopes, a once-in-a-lifetime display of bravado and delusion.

Mr. Alexander's attorneys argue that he cannot be sanctioned, because his fraudulent actions—euphemistically referred to as "foolishness," as if Mr. Alexander is an errant teenager and not a well-educated, upper middle class adult with a six-figure salary and a million-dollar home—all occurred prior to the filing of the lawsuit. (Doc. No. 73, at 25-26.) They contend that Mr. Alexander never lied during the course of the lawsuit, and therefore never displayed contempt for the judicial process. (*Id.*) The Court takes exception to the claim that Mr. Alexander never lied during the course of the lawsuit. The Court was present during Mr. Alexander's testimony at trial. It observed the difficulty

---

[9] In addition to these questionable claims, Mr. Alexander also demanded SFL pay his brother a salary to look after his Houston-area business interests, somehow under the guise of ALE, and pursued reimbursement for "stolen" items which he had allowed others to remove from the Residence.

16

encountered by SFL's trial counsel as she attempted to extract answers from Mr. Alexander to even the simplest questions. (Doc. No. 60, at 133-40.)

But more importantly, even assuming that Mr. Alexander had been completely forthcoming with his past misdeeds during the course of the lawsuit, his decision to sue SFL despite these misdeeds was itself contemptuous of the judicial process. Mr. Alexander is no simpleton. He works or has worked in the finance industry. He has an advanced degree. He operates multiple businesses. At trial, when it suited his purposes, he could be articulate, even persuasive. In short, Mr. Alexander is a sophisticated actor, and he understood the consequences of his behavior. He voided his policy by lying to SFL. He had been refunded all of his premiums. He had no arguable basis for receiving any more money from SFL. And he sued it anyway.

This is not simply a case in which a plaintiff thought the law was against him, but hoped that the jury would be moved by emotion. Lawsuits like that, although objectionable, are commonplace. This case involved conduct which could be said to extend beyond civil fraud to criminality. Mr. Alexander used the judicial system as a continuation of his lawless efforts to exploit the July 24, 2005 fire to squeeze additional money from SFL. There was no basis for recovery that was even colorable. Mr. Alexander hoped to deceive this Court and a jury using the same tactics that had already failed on SFL.

Mr. Alexander's actions were manifestly in bad faith. Sanctions are warranted.

**D.     Mr. Alexander must pay SFL's attorney's fees through February 17, 2012.**

The Court's conclusion that Mr. Alexander filed and pursued meritless claims against SFL in bad faith and for an improper purpose supports the imposition of sanctions under any of the Texas and federal sanctioning schemes listed above. SFL requests, as sanctions, the payment of its attorney's fees expended in defense of this regrettable case. (Doc. No. 65, at 7.) The Court finds this to be a fitting sanction, proportionate to the harm occasioned by Mr. Alexander's conduct. *See Mercury Air Group, Inc. v. Mansour*, 237 F.3d 542, 548 (5th Cir. 2001) ("[C]ourts must impose the least severe sanction on attorneys and parties who violate Rule 11.").

Unfortunately, the procedural requirements for federal sanctions prohibit the imposition of attorney's fees incurred in federal court. As noted above, Rule 11 sanctions can be imposed pursuant to a motion by the opposing party, or through the Court's own initiative. The procedure and type of sanction available differ depending on which of these avenues is taken. Sanctions cannot be awarded pursuant to a motion unless the movant complies with the 21-day "safe harbor" of Rule 11(c)(2). This provision requires the movant to serve the motion for sanctions on the offending party 21 days before filing it with the court. *See* FED. R. CIV. P. 11(c)(2). If the "challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected" before the 21-day period elapses, then the motion for sanctions "must not be filed or be presented to the court." *Id*. The comments to the 1993 amendments of Rule 11 explain how the "safe harbor" provision is intended to work:

The motion for sanctions is not . . . to be filed until at least 21 days . . . after being served. If, during this period, the alleged violation is corrected, as by withdrawing (whether formally or informally) some allegation or contention, the motion should not be filed with the court. These provisions are intended to provide a type of "safe harbor" against motions under Rule 11 in that a party will not be subject to sanctions on the basis of another party's motion unless, after receiving the motion, it refuses to withdraw that position[.]

In this case, SFL's motion for sanctions does not comply with the 21-day safe harbor provision. At trial, Mr. Alexander moved to voluntarily dismiss all claims in the case. SFL consented to dismissal "subject to [its] ability to come back and ask for sanctions." (Doc. No. 60, at 149.) SFL maintains that the case was not effectively dismissed during the last day of trial, because the Court "declined to consider SFL's requested terms of dismissal [i.e., the imposition of sanctions] at that time." (Doc. No. 70, at 2.) Even assuming this is true, Mr. Alexander abandoned his claims as of May 8, 2013. SFL served its motion for sanctions on July 2, 2013. As of the time the motion was served, Mr. Alexander had offered to "withdraw[]" and "correct[]" his offending claims. He reiterated that offer when he filed a formal motion for entry of order of dismissal on August 21, 2013. (Doc. No. 63.) It cannot be the intent of Rule 11 that a motion for sanctions can be presented to the Court after 21 days of "safe harbor," despite the offending party's offer to withdraw the offending claims, simply because the movant refuses to accept the withdrawal. This would be a perversion of the "safe harbor" rule.

The Court has power to order sanctions on its own. This authority is not subject to the 21-day safe harbor period. *See* FED. R. CIV. P. 11(c)(3). Rule 11 sanctions issued pursuant to the Court's own authority are subject to important limitations. First, the sanction may not include an order directing payment of attorney's fees to the opposing

side; such a sanction is authorized only if the sanctions are "imposed on motion." *See id*. at 11(c)(4). Additionally, if the offending party voluntarily dismisses its claims before the show-cause order is issued, the Court may not impose monetary sanctions. *See id*. at 11(c)(5)(B). This means that the Court, at this point, is limited to imposing nonmonetary sanctions.

Nor does the Court feel it appropriate to rely upon its "inherent authority" to award SFL's attorney's fees in federal court. Rule 11 provides for corrective action against the misconduct engaged in by Mr. Alexander. Nonetheless, on its terms, Rule 11 does not allow the Court to sanction Mr. Alexander by awarding SFL its attorney's fees. The Court believes it would be improper to circumvent the procedural safeguards of Rule 11 by resorting to an unwritten, unconstrained "reservoir" of judicial power. *See Chambers*, 501 U.S. at 67-70 (Kennedy, J., dissenting) (warning that permitting courts to invoke inherent authority when rules and statutes would otherwise apply encourages them to skirt textual and procedural requirements established by Congress); *see also Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1407 (5th Cir. 1993) ("[A]lthough a court may have inherent power to do that which is not specifically provided for in the [Civil] Rules, it may not do that which the Rules plainly forbid.").

Neither Texas Rule 13 nor Chapter 10 of the CPRC contains any safe harbor provision, however. Therefore, the Court sanctions Mr. Alexander pursuant to those Texas sanctioning schemes, and orders Mr. Alexander to pay SFL the attorney's fees incurred in defense of this case through February 17, 2012, the date that SFL removed the lawsuit to federal court.

20

IV.    **CONCLUSION**

The Court does not easily grant sanctions. The open doors to justice are a justifiable source of pride in this country, despite the inevitable consequence that many claims and defenses will ultimately fail. But while all litigants are owed the benefit of every doubt, there are no doubts with Mr. Alexander. In the claims process, he lied and schemed to extract money from SFL to which he was not entitled. When his duplicitous tactics failed, he attempted to achieve the same result using the courts of law. This decision is the essence of bad faith. SFL should not be responsible for shouldering the costs of Mr. Alexander's temerity.

For the reasons stated, the Court **GRANTS** Defendant's Motion for Sanctions (Doc. No. 65) and orders Plaintiff to reimburse Defendant's attorney's fees incurred through February 17, 2012. The Court also **GRANTS** Plaintiff's Motion for Entry of Order of Dismissal (Doc. No. 63) and **GRANTS IN PART** and **DENIES IN PART** Defendant's Cross-Motion for Attorney's Fees and Costs (Doc. No. 64). The claims will be dismissed with prejudice. Pursuant to Rule 54 of the Federal Rules of Civil Procedure, SFL is the prevailing party and will recover its costs. With the exception of the attorney's fees awarded as sanctions, each side will bear its own attorney's fees. Parties are ordered to submit an agreed form of final judgment within ten days of the entry of this order.

**IT IS SO ORDERED.**

**SIGNED** in Houston, Texas this the 11th day of February, 2014.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

21